The last case called for oral argument is People v. Wolfe. Counsel? Thank you. My name is Jason Barnhart. I am counsel for Virginia v. Wolfe on this appeal. And I was also co-counsel with David Williams in trial on this matter. This appeal brings before this court two very interesting issues. The first being these error principles, codified in Supreme Court Rule 431B, which are admonitions by a judge to a jury, and requests to a jury by a judge. The jury selects a process. The second issue is a suppression issue involving the Edwards principle, which is the contact of an investigator with a defendant after they invoke their right to counsel. With regard to this error principle, there's not much factual basis to argue because the court has before it a complete transcript of Judge Dunn's questions. The briefs that have been submitted by both sides in this matter, both the transcripts almost ad nauseam as to what's been involved in this matter, as well as the record that has been supplemented by recent cases that have been handled down by the various districts, appellate districts in our state. Just with regard to this error, though, I'd like to point out that the state is arguing harmless error in that matter. They have stipulated and admitted Judge Dunn did commit three errors in regards to 431B. I believe that can be found on pages 21 and 22 of their brief. However, as trial counsel, not just in this matter, but several matters involving serious felonies such as murder, I would position to this court that there is no such thing as harmless error in a case, particularly a murder case, when it's the jury selection process. Every decision by a trial judge in any case, but I'm pointing out to a murder case, can have a still fault. What I'd like to point out as Judge Dunn's errors in this matter is to use the phrase do you have a problem with that, after he would ask questions regarding the right to not testify so and so. And that's not what 431B says the judge must do. We've cited cases that say that the Supreme Court rules must be looked into. They're not something that can be used at discretion. These rules are in place for a reason. Again, we've argued that point, I believe, almost ad nauseum in our briefs. And I just leave that to the Court with the added position that there is no such thing as harmless error. I'd like to next turn my attention to the second issue in the briefs, which is the suppression issue. I'd like to give the Court a little bit of background about Jenny Wolfe and then also give some facts regarding this particular case. It is uncontroversial that Jenny Wolfe was someone who had limited social skills, almost backwards in nature. She had limited learning abilities. In fact, the Court points out that she had learning disabilities and was, in fact, at some point in time, a special class. However, Judge Devlin wanted to say, the reason he did not suppress this, I'm going to put this out there in an argument for the rest of the case, that she was, quote, unquote, not retarded, which is not the standard that I want. The defense has put before this Court the proposition that the videotaped statement by Jenny Wolfe, enlisted from Inspectors Peay and from Inspector Kelly Hemby, was a violation of the principle. As I mentioned, this is the principle that once a defendant invokes the right to counsel, there can be no additional questioning. In fact, there are cases that we have cited that says there can be no additional contact from law enforcement to that defendant until counsel has, in fact, been obtained. Or, that defendant seeks out the investigator and then says, I wish to make a statement. In this case, it is very clear that Inspector Hemby violated the principle set forth in that case, that he, in fact, initiated the contacts that led to the eventual statement given by Ms. Wolfe. And the statement given by Ms. Wolfe... At that time, when he asked her, I think he represented that she said, or he said, can I answer any of your questions? She didn't make any incriminating statement in response to that. Is that correct? That's correct. And then she talked to her father, and then she went in and waived the attorney. I'm going to get to that sequence of events. In fact, I almost jumped right to that. I lost my train of thought on the other report. The State has filed in this appeal a motion to supplement the record on appeal. It included two waiver forms and also included Inspector Hemby's report of events. And so this is part of the record, so I'm going to point and highlight some facts of this out to the court today. In that, People's Exhibit 1, the first paragraph, Inspector Hemby says, I was present when Jenny was allowed into the outside lobby of the police department. This is after she invoked the right to counsel. I may want to make one point before I go on. I want the court to also remember that when Ms. Wolfe was brought to the police station, it was by virtue of the fact that a deputy sheriff came and knocked on her door. It may have been a city officer, but an officer came and knocked on her door. Again, this is somebody with limited social skills, somebody with limited functioning ability to some extent, who relies on authoritative figures. That's all in Dr. Cuneo's report, the courthouse report. Being requested by police officer to come downtown. She did not drive herself. In fact, the brief pointed out that she was placed at the back of a squad car with locking doors to the gate the whole nine yards as if she was under arrest. Again, we're talking about an 18-19 year old girl at this time. She didn't have a driver's license, did she? Without a driver's license, yes. Then transported to the police station where an inquiry started by Inspector Henry, Inspector Speed. Then she invoked this right to counsel or this question about what counsel in which the interrogation stopped. This is when she's allowed to leave the lobby of the police department. Again, she can't actually leave. She can't transport herself away from this setting. This is why we've argued that this is a custodial setting in essence because she herself cannot go out, get in her car, turn the key, and drive away. How far is she lifted from the police department? Claremont is quite a bit of distance from the lobby of the police department. I don't have MapQuest with me, but I know it's more than five to ten miles. It's an outlying area. It's not in town. It's not walking distance. It's not three or four blocks away. It's a situation where she had to be escorted by police, as I said, via car to the police station. So she has to wait on one of two people. Her father showing up, as Justice Wexner has pointed out, or, as she stated in her report, Irena Cotton, who is at this time a co-defendant, to escort her home, or maybe even the police to take her home. But it's not a situation where she is free to leave. Although they say she's free to leave, she is not, by virtue of the fact that they escorted her there, free to leave. After she goes outside of the interrogation room, and that's why all of you are laughing right here, Inspector Kennedy comes up and says, Do you want a soda? Can I get you a soda? That's the first violation. That is initiating contact with somebody who has invoked their right to counsel. By offering to get him a soda? He says, I advised Jenny if she wanted a soda or anything else, let me know, or a radio special note. Jenny asked me if I could step outside to smoke a cigarette. Again, she still thinks that she's under the control of Inspector Kennedy. By his own words and his support. She asked him, can I go outside? She still thinks that she's under the control of law enforcement at this time. I advised her she could leave if she wanted. She was not under arrest and free to go. Again, that's his words. Again, think about who he's talking to. Any woman. Limited social abilities. Limited mental abilities. Let's just go. Again, he says that, but who brought her there? She wasn't free to go. Inspector Kennedy knew this. She stayed at the arena before she left. They'd come together, they'd leave together. Jenny went out to the front of the building and sat down on the step. Inspector Kennedy's quote in that same report I've asked before. I went outside approximately ten minutes later to ask her if there was anything else she needed. Second violation. First violation. Either way, it's a violation. He went outside, he initiated contact. Again, he has a hint. Inspector Kennedy is well known in our circuit as a person who has had many years of experience with this. He knows there's a crack there. He's going out after that crack. He wants to make it to Dan. He wants to open the floodgates. He wants Jenny to confess. He initiated contact. Jenny didn't come in and ask for another soda. Jenny didn't come in and ask for anything else. He says, I went outside. That's telling him these words. She was upset and told me she didn't know what to do. Again, he's continuing the conversation. Does he say, wait a minute, you've invoked counsel? No. He continues the conversation. Your father always told her to ask for an attorney. She was in trouble. This is before the father gets here. So he's still, he's engaging her. He's not saying, look, I can't talk to you. You've invoked counsel. He's engaging her, getting her to open up. Could he ask her if she wanted a ride home? At this point in his report, no. He has not done that. No, I said, could he? Pardon me. Or would that still be improper? I would posit that would be improper. Again, he's engaging. It's a black hole. The court reads the progeny from Edwards on. It's a fairly black hole. In fact, we cited another case that was pulled out in our reply brief that the court found that it's even a two-week period. In fact, the Supreme Court, US Supreme Court, found that because this contact happened after more than two weeks, it was OK. I believe that was the Maryland case. I can't remember the exact site off the top of my head. Maryland v. Schatzman, I believe, is what we cited. Again, he goes back inside. In fact, the exact words are, after that contact, I went back inside the police department. I returned in approximately five minutes. Jenny was standing against the rail in the front step of the police department. She asked me if others were involved. We're telling you what happened. I advised the investigation had been going on all day and that new statements were being obtained from several people. Again, he went outside. He made an overt effort to go make contact with Jenny. Or I would also posit, make themselves available to contact with Jenny. Again, we're dealing with somebody who doesn't function at a high level of intellect. Was she in custody? Did she have handcuffs on? Was there a police officer anywhere assigned to her? No, Judge. That's why I'm making such a strong point about her mindset of custody. She was brought to the police department. She's basically standing there until somebody comes and takes her out. When I say she was brought to the police department, I want to point out again, she was brought to the police department by law enforcement. So she wasn't free to go, as Justice Weston pointed out. She didn't have a driver's license. She didn't have an ability to get back out to Claremont, which is a rural area from Alde, Illinois. Then it goes on. That's when Mr. Bull shows up. But again, Inspector Kennedy has been putting so much pressure on her, has been inviting these contacts with her at this point in time. He even tells her how to make these statements. She feels like she has to come in and give a statement of self-determination or a statement of bankruptcy or something. But again, I want to point out to the court, and you have the Dr. Cuneo report attached. You have the testimony that was read into the record. That shows what a functionality she had with regard to all this. In fact, part of Dr. Cuneo's report and part of the research brought into this case was, at age 15, Jenny Wolfe was abandoned by her family, essentially. Her mother was off. Her dad was a truck driver on the road. She fell into this copper family. And in part of the report, Jenny admits that she looked to Irena Coffin as a figure, as an authoritative figure. This is somebody who was abandoned without authoritative figure, who seeks authority out for guidance. You can see by questions, when Inspector Kennedy made himself available, you can see the questions she had was she was seeking advice from someone who was an authoritative figure. She doesn't know what to do. She just knows that she's supposed to invoke the right counsel. She did that to begin with. Here comes Inspector Kennedy, another person of authority, and she's asked him what should she do. She wouldn't have asked those questions, and we paused for the court, that she wouldn't have gone back inside had Inspector Kennedy not kept making those comments. That's why it's a clear-cut Edwards violation. Again, this statement was so important to the trial that this statement was viewed by the jury not once during the course of the trial. But it was requested to be seen again during deliberation. The court has that. The statement is so incriminating, it's so bothersome, even by the jury, that they had to see it twice to make a decision in this case. But the problem is that the tape shouldn't have been there in the first place, but it should have been suppressed. If the court allows this statement, or refuses to send this case back to trial to suppress this statement, what this court is providing in policy, and we see it in our trial of all time, is the ability of an inspector, Kennedy or another inspector down the road since he's now retired, to say, you know what? They really don't worry about that Edwards principle. They've carved out so many exceptions here that we'll get involved with that statement. That's been a problem that's been out there. We have carved so many exceptions. This is a policy exception. It is clear-cut. Both counsel, he sought her out not once, not twice, but three times. And on the second time, she actually started questioning him about what she should do, because he made himself available. That was contrary to Edwards. If the court does not have any questions, I will turn the podium over to you. Thanks, Justice. Thank you, counsel. Counsel? Thank you. And may it please the court, counsel? First, just quickly as to the Rule 431B argument, the state is arguing both harmless error and also that there was no plain error under the second prong of the Heron test. Counsel stated that we're only arguing harmless error. But in fact, we're arguing both. And of course, we're waiting, as I suspect the court is, for a ruling by the Supreme Court in the Thompson case that is currently up there. That will probably decide this issue. It certainly appears from reading the Rule 23. And when's that going to come out? Well, Your Honor, I spoke to the clerk's office last week. And they stated that the case is fully briefed. It hasn't been argued yet? No, Your Honor. OK. I think there's a number of cases like that up there, right? More than one? There are. As of this morning, I found three cases with pending leaves to appeal that haven't been decided on either way. Perhaps they're waiting on those as well, although I don't know for sure. The counsel argued that the words, do you have a problem with that, rather than asking whether the potential jurors understood and accepted the principles was error. This is an argument that's answered in the People's Brief. And it's also answered by the new cases, People v. Vargas, and People v. Chester, one of the cases that People has moved aside as additional authority. Other than those points, I'd only point out that the defendant's case, Schaefer, cited in the reply brief, is like those cases cited at pages 20 and 29 of the People's Brief, cases answered by the new cases, Hammons and Magellan, as also cited as additional authority by motion of the People. With regard to the suppression issue, the defendant today has placed great emphasis on her alleged limited social and mental skills. I'd point out that this is not an argument made in the defendant's briefing and is forfeited under Rule 341. I'd also point out that, as the defendant stated, the judge did consider the defendant's mental state when considering whether she was in custody and stated that, no, she was not retarded, that she knew and understood her constitutional rights. Additionally, I'd point out, as to her social skills, that she worked at Walmart, and, in fact, the record shows that she had worked there, quit her job because she had moved out of the area, and she moved back to the area and got her old job back. Certainly something that shows social skills to ask for your old job back and get it. The remainder of the defendant's argument goes to the question of whether she voluntarily initiated the third interview or whether she was somehow badgered into it by Officer Henby. But what I'd point out is that the defendant is leapfrogging over the question of whether she was in custody. Now, the trial judge in this case made a thoroughgoing and meticulous order, including many findings of fact that the defendant, on appeal, does not question. Findings of fact such as the deputy who arrived at the home asked if she could, quote, please come in for questioning and said that she was not under arrest. That the defendant was told that she was free to leave multiple times, including when she asked Officer Henby if she could go outside and smoke. I'd also point out that the argument that the court has heard today that she, well, really wasn't free to go because she didn't have a ride home. I'd point out that, number one, she certainly could have left with her father. She certainly could have asked for a ride after having been told she was free to go. Also, this isn't an argument, again, that was made in the defendant's briefing. And finally, if the defendant was feeling badgered on the police department steps when she was standing outside completely alone before Henby reappeared on the steps, she was certainly free to, say, walk across the street and wait for her friend there. The trial judge found that it was, quote, totally defendant's choice to stay at the police department and wait for Irina Kotner. She was totally alone for periods of 10 minutes and then 5 minutes. And then also left completely alone with her father, who arrived and asked what was going on. So the Edwards case does indeed hold that once a defendant who is in custody asks for an attorney, that further police-initiated custodial interrogation is forbidden. But here, because the defendant was not in custody, the question under Edwards, you'd never arise, it's enough for this court to find that she was not in custody. Moreover, the exchanges with Officer Henby outside on the courthouse steps after, as the trial judge found, she'd been repeatedly told she could leave, were not police-initiated custodial interrogation. She was advised of her Miranda rights ahead of time. She had been advised of her Miranda rights twice that day, Your Honor. First at the Lawrenceville Police Department at about 1 o'clock that afternoon. She signed a Miranda waiver form there. And then she was also advised of her Miranda rights during the second police interview, the one that lasted 16 minutes and that was ended when she requested counsel. She was not separately Mirandaized at the third interview, but Officer McLaren, and this is spelled out in the people's brief at pages 42 and 43, specifically asked her if she would like her rights read to her again, and she said no. She heard them twice and she understood. She understood them and didn't need them to be repeated to her. But she wasn't caught in the state in custody. The police were just being extra cautious. Actually, that's exactly what the trial judge said, Your Honor, in his opinion, that often conscientious police officers out of caution do advise suspects or anybody being interviewed of their rights so as to avoid problems down the road. The cases that the defendant cites having to do with badgering or coercion of a person who has stated that he or she would like to speak to an attorney, these are cases in which there was custodial interrogation going on, but the defendant was never in custody and she certainly was not in custody as she stood outside alone on courthouse steps or police department steps or stood outside alone with her father. In fact, the facts of what happened during those exchanges on the steps showed that if anybody coerced the defendant into giving a third interview, it was the defendant's father. What happened was this, that the defendant walked outside and was alone for ten minutes solid, completely alone, smoking on the steps. Officer Henvey walked out. He said in his statement that he did so because, number one, she was upset and he wanted to see if she was okay, and number two, he was concerned that the victim's family might approach her and try to confront her about what had happened after all this all occurred on the same day as the murder itself. Your argument wouldn't be any different, would it, if she was in custody? Would you make the same argument basically? As far as who initiated the discussion, whether or not it was voluntary or what have you? If she was in custody while she stood on the police department steps. Right. Would your argument be any different if this court found that she was in custody? Well, certainly, Your Honor. When a person is in custody, it's possible for there to be a third police interview if that person had voluntarily re-initiated another interview and had knowingly waived her rights, and it's certainly true that we're arguing both of those factors occurred. Okay. I find it difficult to imagine that scenario, though, Your Honor, in light of the fact that she was left completely alone on the police department steps for periods of five to ten minutes and also left alone with her father, who, by the way, may I add, was also advised, as the judge found, that she was free to go. What happened was this, that after this first ten-minute break, Henry walked out and asked if she needed anything, to which she responded that she didn't know what to do, to which Henry responded that he couldn't ask her any questions because she'd requested a lawyer but that he would try to answer any if she had any. I'd submit that neither of those statements represent police-initiated custodial interrogation. Neither of those statements are statements that he expressed questioning or statements that he ought to have believed could elicit an incriminating statement. He went back inside, another five minutes passed, and he walked back outside, didn't say a word until she asked if anything else. If a suspect is not in custody and boasts her right to an attorney, is there any restrictions on further police interrogations? Well, certainly the defendant in that situation would always have the right to remain silent and could invoke that at any time. No. We always have the right. No. Maybe I'm not correct. If a suspect has invoked their right to count but is not in custody, are there any restrictions on subsequent interrogations by the police? I don't believe so. I certainly haven't seen any case law indicating that there would be. Now, it's not a question that people brief, you'll understand. It's not a question that was briefed at all in this case. Go ahead to concede that point. But it's certainly Edwards. I understand you're arguing that she wasn't. Sure. Certainly Edwards and Miranda both are phrased only in terms of custody, of the inherent course of effect of custody, a course of effect that did not exist here as she stood alone with her father on the police department steps after he was told that she was free to leave and presumably could have taken her with him and presumably if he believed that she was being taken advantage of because of her alleged limited mental and social skills, he would have done something about it. What happened was he walked up and asked Officer Henby if he could speak to his daughter alone for a bit, and they proceeded to have a heart-to-heart, father and daughter alone, and then about five minutes later Officer Henby came back out and the defendant said to him, apropos of nothing on his part, I would like to go back inside and give another statement. And what I'd like this court to note is that of all of the discussion of what went on during these exchanges, that this was the first indication or this was the first time that even the possibility of an additional interview was mentioned. This is not a case where Henby was asking her to give another interview. When she went back in, was she again given her Miranda rights? Officer McLaren asked her if she would like to hear them again, and she responded that no, she knew them and did not need to hear them for a third time that day. The facts relating to this initial, as Officer McLaren put it, clearing the air about the legal effect of her request for counsel is spelled out in the block quote at pages 42 and 43 of the People's Answer Brief. Outside in the police house steps, there was no incriminating statement made by her to Henby at that time until she went back in after she talked to her father. That's correct. Officer McLaren, when she went back inside, explained to her quite thoroughly that she needed to come to them and volunteer more information and that she needed to knowingly and intelligently waive her rights and be trial judge found that she did so. I think as to the other points, I'd just rely on the people's briefing except again to point out that the issue of custody is dispositive of the Edwards issue. Does the court have any questions? Thank you, counsel. Counsel? I'll be brief. First, it was positive to this panel that the issue of Ms. Wolfe's disability was waived by not being briefed. However, I'd like to point out that on the very last page of our reply brief, we mentioned that it's admitted that she has limited social and mental skills. Also, it's set forth in the state's page 35 that it was an issue. We just left that for our arguments. We didn't feel like that was waived. In fact, it was raised at trial court in the motion reconsidered. So we'd ask the court not to deem that issue waived. The court has raised interesting points with the state in questioning whether being in custody matters or not. Neither side has cited case law regarding what is custody in these types of circumstances. We have cited the Edwards versus Arizona progeny. But I would ask the court to exercise great caution if it would deny the appeal here based on the fact that it finds that Ms. Wolfe was not in custody. Again, on a policy basis, what that kind of really would promote would be that law enforcement officials could find people who are like Jenny or even people who have their own transportation at that point in time and say, come on in and talk to us. We just want to talk to you about it. You're not under arrest. Just come talk to us. And they feel that pressure to come talk to you. They get down there and say, wait a minute. I want counsel. That's okay. You're not in custody. You're free to go. But the key here is they still invoke. They felt like they were not custodial possession of the state or law enforcement. They felt the need to invoke that right. In fact, the state at that time felt the need to give Miranda waivers. That gives the imposition that there's a custodial interrogation going on. They talk about things. They want to videotape things. They're in a confined room. It's somebody in Jenny's place and mine. That is custody. I want to point out one other major point in this regard. On page 25 of the appellant's brief, second-to-last paragraph, near the very bottom of that paragraph, or actually the second full paragraph, if officers initiate communications with the suspect, no waiver of rights can be valid. In addition, in parentheses, this is also kind of cited in the same case. This is Arizona v. Robertson, 46, U.S. 675, 1908 case. Waiver and authorities instigation is presumed compelled, not the product of voluntary choice. It's a U.S. Supreme Court case, and that is exactly what happened here. Authorities prompted. This will come back in. Any waiver after that cannot be a product of voluntary choice. It's presumed that there was coercion. Thank you, Justice. I appreciate your time. Thank you, Counsel. We appreciate the briefs and arguments of counsel. We'll take this case under advisement. There being no further questions, we'll adjourn.